(Nos. 2295-2296, Consolidated—

JOHN B. KING, No. 2295 AND HELENA A. HATHAWAY, No. 2296, Claimants, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed December 14, 1937.*
*Rehearing denied January 13, 1938.*

FRANK J. JACOBSON, for claimants.

OTTO KERNER, Attorney General; JOHN KASSERMAN AND GLENN A. TREVOR, Assistant Attorneys General, for respondent.

MR. JUSTICE YANTIS delivered the opinion of the court:

Claimants herein seek damages as the result of an automobile accident, alleged to have been caused by the negligence of one Peter Sauber, a former employee of the State in the Highway Department. The complaint alleges that on March 30, 1932, about 4:30 P. M., on Route No. 64 about three miles west of St. Charles, Illinois, the claimants were riding in a Buick automobile owned by the mother of claimant, Mrs. Hathaway, and then and there driven by the owner's colored chauffeur. That Peter Sauber was the owner of and in possession and control of a Model A. Ford Truck with which he drove out from a side entrance leading to a filling station, into the pathway of claimants, causing them to swerve back and forth across the road and to eventually crash into a nearby tree causing serious injuries to both claimants. Claimant in each case seeks an award of Fifteen Thousand ($15,000.00) Dollars, and as the facts, the law and the parties in each case are the same, the two actions have been consolidated and are herewith considered under a single opinion. Rather extensive evidence has been produced, and comprehensive briefs and reply brief have been filed.

A motion by the Attorney General to dismiss the complaints was filed and argued orally before the court, but action thereon was postponed until a final hearing of the case on its merits. Plaintiffs contend that the record discloses the accident was caused by one who was then and there in the employ of the State and then and there engaged in the duties of his employment; that the accident having occurred through the negligence of one so employed, the State of Illinois should be liable as the master of such servant by reason of justice, equity and good conscience.

The Attorney General, on behalf of respondent, contends that although Peter Sauber was an employee of the State

of Illinois, he was not, at the time of the accident, engaged in the performance of any work for his employer; that the accident was not the result of such employee's negligence; that even though the employee was negligent and in the performance of his duties as an employee, the respondent could not be legally liable because of the fact that the doctrine of "Respondeat Superior" does not apply to the State in connection with the negligent acts of its employees. Counsel for claimant states:

"There can be no denial that the doctrine of respondeat superior does not apply to the State * * * as an ordinary legal defense, but placing ourselves squarely under the section of the enactment (Court of Claims Act) which provides for Equity Jurisdiction and Procedure, the fact that the doctrine of respondeat superior does not apply does not in any way abate claims before this Court * * *. That the court has been granted equitable powers for the purpose of hearing and determining matters in accordance with equity and good conscience."

The evidence discloses that Peter Sauber was an employee of the State, engaged in assisting the Highway Maintenance Patrolman assigned to the territory in question: That he went to work at 7 o'clock A. M. on March 30, 1932; was off thirty (30) minutes for lunch, quit work at 4:30 P. M. and was employed and paid for nine (9) hours work on the day in question. That after he left his superior he drove his Ford truck to the Anderson Filling Station on the south side of Route No. 64 about three miles west of St. Charles, where he stopped and unloaded certain tools that were being kept there. His home was several miles west of that point and he drove out from the filling station onto Route No. 64 to go westward to his home.

Sauber testified that he saw plaintiff's car coming from the west before he drove onto the highway; that it was traveling at a speed which he estimated at seventy (70) miles per hour, but that he drove in, on and across the highway to the north side thereof intending to let it go by; that the approaching car was going eastward and swung toward the north side of the pavement so that he found it necessary to swing to the left to avoid a collision; that he proceeded westward without knowing that any accident had occurred. Another car, driven by one Ebert Olson, was coming from the east at the time Sauber drove out onto Route No. 64 which Sauber testified he also saw; that at the time he drove onto the highway plaintiff's car was about four hundred (400) yards away and

traveling seventy (70) miles an hour; that the Olson car that was coming from the east at that time was "about again as far away," but that he had no opinion as to the latter's speed.

Olson testified that Sauber's truck "came out of a driveway at the Barbecue Stand onto the highway. The next thing I noticed was that a car had to swerve out to miss him, had to go out into the other lane to miss hitting this truck and it was a good thing it wasn't coming any faster;—in order for this car that swerved out to miss me he had to cut back. The next thing I knew he was in the ditch—I observed the truck as I approached the Barbecue Stand. It came out suddenly, then it kind of stopped or slowed down after it got in the road—it was right in the way of eastbound traffic."

The evidence discloses that while it had been misty wet weather, the pavement was dry at the time of the accident. The witness Olson, observing that Sauber was leaving the scene of the accident without stopping, pursued him for three miles, then drove in front of him and compelled him to stop. Sauber testified that Olson then said to him, "Say, you sideswiped a car up there by Anderson's and you'd better go back. I told him 'hell I am late, I am going home.' He says, 'it will go harder with you if you don't go back.' I says to myself, 'Is that possible?' and I went back.' "

Meanwhile, King and Mrs. Hathaway had been removed from the scene of the wrecked car to the filling station. Both were badly bruised and bleeding. The former suffered a fracture of the right Clavicle, a dislocation of the Humerus and injury to the Scapula, a scalp wound in front of the right ear and down the side of the face, and his teeth had gone through his tongue, making a slit that required several stitches. Mrs. Hathaway had suffered paralysis of the left facial nerve, a fracture of the right Pubic bone, a fracture of the right Radius and Ulna, a fracture of the first, second, third, fourth and fifth Metacarpal bones of the right hand, and a concussion at the base of the skull. Sauber testified that upon his return to the scene of the accident he did not talk to anyone except a neighbor who happened to arrive at that time, and that he then went home and called a local police officer and returned with him to the scene of the accident, at which time the injured parties had been removed. The testimony not only of Olson and the other witnesses, but that also of Sauber, shows that the accident was the result of the lat-

ter's negligence and indifference to the rights of anyone other than himself. His employment by the State ceased a few months after the accident in question, and he is no longer employed by it. Claimants have, without doubt suffered serious injuries and pecuniary damages as a result of such accident.

It is not within the province of this court however, to make an award and to recommend the expenditure of State funds in favor of everyone who may have suffered some injury or injustice at the hands of the State or its employees. Counsel for Claimants in a most able manner presents his theory of the rights of this court to exercise its powers under a broad administration of the doctrine of equity and good conscience. Emphasis is given to the fact that prior to the creation of the original Claims Commission no action to enforce any claim against the State could be instituted in any court, and that it was necessary for any claimant to obtain the friendly and active intercession of a member of the legislature and obtain the benefit of a special Bill appropriating an amount for each specific claim. That many who had just and rightful demands were not fortunate enough to enjoy a political friendship or acquaintanceship which would enable them to have a Bill drawn or presented and were thus deprived of their opportunity for redress, while claims of a less meritorious character might receive preferment and recognition. Counsel argues that in the creation of the Claims Commission and later of the Court of Claims, the legislature intended to establish a forum so broad in its power that not only would there be a court to which the claimant might submit his demands against the State, but that the court in giving consideration thereto should be governed only by the demands of good conscience and social justice. Counsel further contends that by establishing the Court of Claims the legislature intended to say that no longer would it be the rule that the Doctrine of "Respondeat Superior" does not apply to the State, but that thereafter the State should be liable for all such negligent acts of its servants and employees as the members of the court in conscience and equity might deem it responsible for.

The court cannot agree with Claimants' Counsel in these views. When the State provided for a forum in which claims against it might be filed, first under the Commission of Claims

Act of 1877 and later under the Court of Claims Act of 1903, a clause therein provided substantially as follows:

"In case said Commission (Court) shall reject any claim so filed as aforesaid, upon the hearing thereof; such rejection shall conclude all parties thereto, unless said Commission (Court) shall in their award, otherwise direct."

The Court of Claims Act of 1917 contains no such provision. Guided doubtless by the wording of the earlier Acts, the commission (and court) handed down many decisions in which they quoted the above provision and thereafter added in substance the following:

"In order that claimant may present his claim to the Legislature we expressly direct, that under the power conferred upon us by the section, claimant shall not be concluded by the above finding rejecting any claim."
(*Schmidt* vs. *State*, 1, C. C. R. 76.)

In *Rood* vs. *State*, 2, C. C. R. 23, the court after rejecting the claim stated:

"inasmuch however, as we recognize that this is a case appealing strongly to sympathy, the sustaining of the demurrer is hereby declared to be without prejudice to claimant, and the rejection of the claim is not to barr claimant from further presentation of this claim to the Legislature."

Later the court, as in *Holmes* vs. *State* 3, C. C. R. 17 declined to make an award, but nevertheless recommended that the legislature make an appropriation because they believed the claimant was entitled thereto.

After the Court of Claims Act of 1917 was passed with its omission of the proviso of the earlier Act, the court, in certain instances after rejecting the claim for the reason that "under the law the State is not liable" then proceeded to exercise an arbitrary opinion in much the same language as found in *Hunsacker* vs. *State*, 4, C. C. R. 217, where after rejecting the claim the court said:

"Regardless however, of legal liability claimant has sustained injuries as a result of this accident, and the court recommends to the Legislature an allowance to claimant, as an act of social justice, in the sum of $2,000.00."

and again in *Moore* vs. *State*, 4, C. C. R. 229, where it was stated,

"While this court has repeatedly held in this class of cases that the State is not liable, yet in view of the advanced age and poverty of the claimant, and in the interest of social welfare and equity, we have decided to make a small allowance for claimant, and we recommend the payment of $200.00."

Under the practice adopted by the members of the court we thus find awards being given and a recommendation for

appropriation of funds made entirely on the basis of the personal views of the judge without regard to any established rule, or guide of law or conduct. As a result, we find a denial of relief of one case and an award of another, in cases on all fours with each other.

Eventually, the error in granting awards because of "good conscience," and in cases wherein no legal basis for an award existed, the court returned to what had been the original concept of its duty and expressed itself as in the words of Justice Thomas, in *Stoddard* vs. *State*, 6 C. C. R. 29, wherein he said:

"We do not believe it was the intention of the Legislature to leave it discretionary with the Commission to make an award in favor of the claimant regardless of the question as to whether or not he had a legal claim against the State. We are of the opinion further that it would be an exceedingly dangerous precedent to hold that the Commission had any such discretion."

The present court in 1933 was called upon to construe the meaning of Paragraph 4 of Section 6 of the Court of Claims Act, with reference to the meaning of the words "equity and good conscience" as therein used. In the case of *Crabtree* vs. *State*, 7, C. C. R. 207, the following conclusion appears:

"We conclude, therefore, that Section four (4) of Paragraph six (6) of the Court of Claims Act, which provides as follows, to-wit: The Court of Claims shall have power: 'to hear and determine all claims and demands, legal and equitable, liquidated and unliquidated, ex contracto and ex delicto, which the State as a sovereign commonwealth, should, in equity and good conscience, discharge and pay'; merely defined the jurisdiction of the court, and does not create a new liability against the State, nor increase or enlarge any existing liability; that the jurisdiction of this court is limited to claims in respect of which the claimant would be entitled to redress against the State either at law or in equity, if the State were suable; that this court has no authority to allow any claim unless there is a legal or equitable obligation on the part of the State to pay the same, however much the claim might appeal to the sympathies of the court; that unless the claimant can bring himself within the provisions of a law giving him the right to an award, he cannot invoke the principles of equity and good conscience to secure such an award The claimant having failed to bring himself within the provisions of the law entitling him to an award, there is nothing this court can do but deny the claim."

We re-affirm the foregoing at this time. We believe that in passing the Court of Claims Act the legislature recognized that in equity and good conscience the State should provide a means and manner in which claims against it might be heard,

but that it did not in the creation of the court intend to create new liability against the State nor enlarge any then existing.

In Pomeroy's Jurisprudence, Vol. 1, p. 343 the following conclusion is expressed:

"In following out the policy assumed to have been intended by the Legislature, it has been settled that the courts took no powers or jurisdiction over any equitable right or to administer any equitable remedy, except those plainly permitted by the express and positive language of the statutes."

We believe that the use of the words "Claims—which the State in equity and good conscience should pay" refers to claims against the State for which there is a legal basis at law, but for which the claimant prior thereto had no adequate redress, because all other courts were closed to such claimant when seeking redress against the State.

"Another significance sometimes given to equity is that of judicial impartiality * * * the administration of the law according to its true spirit and import, uninfluenced by any extrinsic motives or circumstances * * * the application of the law to particular cases, in conformity with the special intention or general design of the Legislature."
(Pomeroy Vol. 1, p. 36.)

We believe it is in this sense that the legislature used the word "equity" in prescribing the jurisdiction of the Court of Claims, and it is in this spirit that the court is endeavoring to consider the claims that come before it.

We therefore hold in the instant case that inasmuch as the claims herein are predicated upon the purported negligent acts of Peter Sauber as an employee of respondent, that the motion of the Attorney General to dismiss the complaints should be allowed, for the reason that the rule of "Respondeat Superior" does not apply to the State insofar as the negligent and tort actions of its employees and servants are concerned; that such being the rule and there being no legal basis upon which said claims may rest, no award can be allowed on the ground of equity and social justice, for the reason that this court has no authority to allow a claim unless the claimant can bring himself within the provisions of some law giving him the right to an award, and that in the absence thereof a claimant cannot invoke the bare principles of equity and good conscience to secure such an award.

As this case has been submitted upon the evidence as well as upon the motion, we feel constrained to add that the record in our opinion discloses without doubt that the accident in question and the injuries suffered by claimants were

234

due to the wanton negligence of Peter Sauber, without contributory negligence upon the part of claimants; further that although Peter Sauber. was an employee of respondent, he was not, at the time of the accident in question, engaged in the performance of his duties for his employer; that he had worked nine hours for respondent on the day in question and had, according to the testimony in the record, completed his day's work at 4:30 in the afternoon; had unloaded all tools used by him in the performance of his duties, and at the time of the accident was performing no duties or services on behalf of his employer, and that in the absence of the exception to the rule of "Respondeat Superior," there would be herein no legal basis for the assessment of an award against the State of Illinois.

Both upon the merits and upon the motion, an award must be denied.

The motion to dismiss the complaints is allowed, and an award in each case is hereby denied.